IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| WILLIAM ISLAND, | ) | Case No. 1:25-cv-02048-CAB |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.      Introduction

Plaintiff, William Island ("Island"), seeks judicial review of the final decision of the

Commissioner of Social Security, denying his applications for disability insurance benefits

("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security

Act. This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule

72.2(b). Because the Administrative Law Judge ("ALJ") applied proper legal standards and

reached a decision supported by substantial evidence, I recommend that the Commissioner's

final decision denying Island's applications for DIB and SSI be affirmed.

## II.      Procedural History

Island filed for DIB and SSI on May 18, 2023, alleging a disability onset date of

December 31, 2020. (Tr. 200, 208). The claims were denied initially and on reconsideration. (Tr.

114-22; 135-41). He then requested a hearing before an ALJ. (Tr. 142). Island (represented by

counsel) and a vocational expert ("VE") testified before the ALJ on June 12, 2024. (Tr. 34-70).

On July 26, 2024, the ALJ issued a written decision finding Island not disabled. (Tr. 17-29). The Appeals Council denied his request for review on July 30, 2025, making the hearing decision the final decision of the Commissioner. (Tr. 1-3; *see also* 20 C.F.R. §§ 404.955, 404.981). Island timely filed this action on September 26, 2025. (ECF Doc. 1).

## III.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Island was 43 years old on the alleged onset date, making him a younger individual according to Agency regulations. (*See* Tr. 27). He graduated from high school. (*Id.*). He has no past relevant work. (*Id.*).

### B.    Relevant Medical Evidence[1]

On November 26, 2021, Island reported to the emergency room complaining of swelling and pain to his left third phalanx that began three days prior. (Tr. 398). Island claimed he may have injured it on a rusted spike. (*Id.*). During this visit, Island was awake, alert, maintained good eye contact, had a normal affect, and did not appear distressed. (Tr. 399). David Effron, M.D., diagnosed Island with paronychia of the left finger and prescribed him Keflex. (Tr. 400-01).

On January 20, 2022, Island visited the emergency room presenting with throat swelling that had lasted for two days, and treated with Johnathon Frommelt, M.D. (Tr. 395). Island complained of intense, intermittent pressure under his adam's apple that was causing him to gag. (*Id.*). He reported he had been sick two weeks ago and has experienced persistent ear popping,

---

[1] Although Island has diagnoses for physical impairments (Tr. 256), he does not raise any error with the ALJ's evaluation of these. (ECF Doc. 8). Instead, he raises error solely with respect to the ALJ's evaluation of mental impairments. (*Id*. at p. 6-11). I therefore limit my review of the medical evidence only to these issues and deem any argument as to his physical impairments waived. *See McPherson v. Kelsey*, 125 F.3d 989 (6th Cir. 1997).

rhinorrhea, and congestion since. (*Id.*). Further, Island reported suffering a bronchial attack the day before while shoveling and had woken up that day with a deep cough. (*Id.*). Island's physical exam reported evidence of allergic rhinitis, but no wheezing, rales, or rhonchi. (Tr. 396). Additionally, Island was reported as alert, awake, and appropriate, with normal speech, good eye contact, and normal affect. (*Id.*). Dr. Frommelt diagnosed Island with acute nasopharyngitis and prescribed Flonase and Claritin. (Tr. 397).

The next day, on January 21, 2022, Island presented to the emergency room with shortness of breath. (Tr. 391). Island stated he had experienced a coughing fit where felt he was going to pass out. (Tr. 392). He felt like his throat was closing during these coughing fits. (*Id.*). Additionally, he reported shortness of breath accompanied by chest tightness. (*Id.*). Jon Schrock, M.D., noted in Island's physical exam that his lungs were clear, and his heart rate and rhythm were normal. (Tr. 393). Additionally, he noted that Island had a normal affect, maintained good eye contact, and was cooperative. (*Id.*). Dr. Schrock believed Island's symptoms were viral in nature. (Tr. 394).

On January 27, 2022, Island visited the Internal Medicine Clinic with a chief complaint of throat tightness. (Tr. 388-89). Island was seen by Jayne Barr, M.D. (Tr. 391). Island stated that he was experiencing throat tightness for 30 minutes a day for the past week. (Tr. 389). He initially thought eating fish was triggering the tightness, but the tightness had continued despite him no longer consuming fish. (*Id.*). Island further reported that these attacks were associated with anxiety. (*Id.*). At the time of the encounter, Island was taking 25mg of Atarax three times a day as needed for his anxiety. (*Id.*). Listed under his current medications were Prilosec, Elavil, and Celexa, but Island reported that he was not currently taking them. (*Id.*). His heart rate and rhythm were normal, his breathing sounded normal, his breathing effort was normal, and he was

3

alert as well as oriented to person, place, and time. (Tr. 398-90). Dr. Barr believed the throat tightness was likely vocal cord dysfunction and recommended Island see an ENT specialist. (Tr. 391). Further Dr. Barr recommended Island continuing his Atarax as needed for his anxiety. (*Id.*).

On February 3, 2022, Island saw D'Andre Warren M.D., an ENT specialist, with complaints of throat tightness, morning cough, throat clearing, globus sensation, heart burn, and an episode where he had left back and arms spasm, discomfort, numbness, and tingling which progressed to include his bilateral anterior neck and posterior neck. (Tr. 385-86). A prior visit at the emergency room ruled out PNA, Covid, and ACS. (*Id.*). Island was taking Atarax which helped with his symptoms when he also would try not to think about things or get worked up. (*Id.*). His physical exam revealed he was breathing comfortably on room air, no stridor, and had no lymphadenopathy or thyroid masses, but did reveal that he was tender to palpation of the thyroid membrane, strap muscles, sternocleidomastoid muscle, paraspinal muscles, traps, shoulders, and pectoral muscles. (Tr. 387). Because the left tympanic membrane could not be visualized, Island agreed to a bedside cerumen disimpaction, which he tolerated well; the left tympanic membrane appeared to be normal after the procedure. (*Id.*). Island also underwent a flexible nasolaryngoscopy which revealed a normal nasal cavity, nasopharynx, oropharynx, hypopharynx, and all endolaryngeal structures. (*Id.*). However, the significant findings from this procedure included: mobile VF ("vocal folds") bilaterally, hyperemic VF bilaterally, right anterior VF nodule, left posterior VF nodule, post-cricoid edema, pooling of secretions, no lesions or masses, and patent airway. (Tr. 387-88). Island's presentations were consistent with reflux with regards to cough, morning throat clearing, and voice changes; the voice changes and neck tension were consistent with and muscle tension dysphonia. (Tr. 388). The scope exam was

consistent with both diagnoses. (*Id.*). Because of Island's history of anxiety and his partial improvement with anxiolytics and distraction techniques, Dr. Warren believed these symptoms may be related to his anxiety but could also be anatomical or physiologic in nature and what was provoking his anxiety. (*Id.*). Dr. Warren recommended 40 mg of omeprazole before dinner and lifestyle changes to help with reflux and physical medicine and rehabilitation for muscle spasms. (*Id.*). It was recommended Island follow up in six weeks. (*Id.*).

On March 3, 2022, Island had his ENT follow-up with Bryan Hair, M.D. (Tr. 378). Island complained of post-nasal drip at this visit. (*Id.*). Island reported taking Prilosec consistently as well as incorporating lifestyle changes which had led to his symptoms improving. (*Id.*). He also intermittently took Tums and felt like his reflux symptoms were almost entirely gone, but had continued to often experience bloating. (*Id.*). Dr. Hair noted that since Island's last visit his symptoms had improved and were largely resolved; though he complains of bloating, it was no longer associated with heartburn. (*Id.*). Dr. Hair recommended he try Gaviscon, but to also schedule an appointment with GI if his symptoms did not improve. (*Id.*).

Island visited the emergency room on April 6, 2022, and was seen by Cara Puzzio, D.O. (Tr. 369). Island presented with abdominal pain and bloating that had lasted for two weeks with no relief despite using his GERD medications. (*Id.*). These symptoms had been better with Omeprazole and Gabapentin, but his symptoms had worsened over the past couple of weeks which was causing him to use Gas-X and Gaviscon a lot. (Tr. 370). The distention initially occurred only when Island ate but now was occurring throughout the day and waking him up at night. (*Id.*). Dr. Puzzio marked Island positive for activity and appetite change, abdominal distention, pain, and constipation. (*Id.*). Island was also marked as nervous/anxious. (*Id.*). Island's physical exam revealed that his abdomen was soft, tender, and distended. (Tr. 371). He

5

was reported to be alert and oriented with normal speech and a normal affect. (*Id.*). Dr. Puzzio diagnosed him with abdominal distention and recommended he follow up with his PCP and GI. (Tr. 372).

On May 2, 2022, Island went to the emergency room complaining that the night prior, he experienced mid/left chest pain and was currently experiencing numbness/tingling on his entire left side plus chest discomfort with shortness of breath. (Tr. 365). He was seen by Emilee Ritchie, D.O. (*Id.*). He reported an episode of dysuria with black specks in his urine, but that the pain had stopped after urination. (*Id.*). He later explained that this numbness/tingling has been occurring for several months. (*Id.*). He reported feeling like his throat was getting tight, similar to a GERD flare. (*Id.*). Island added he had been taking his Prilosec but had cut down because he was experiencing constipation. (*Id.*). He also cut back on his Gabapentin because it was causing headaches, however, he claimed it had been improving the numbness/tingling sensations. (*Id.*). His psychiatric/behavioral symptoms were negative for agitation, behavioral problems, confusion, and suicidal ideas, but Island was marked as nervous/anxious. (Tr. 365-66). Island's physical exam revealed clear lungs as to auscultation, no wheezing, no rales, no respiratory distress, no cyanosis, regular heart rate and rhythm with no murmurs. (Tr. 366-67). Island was marked to be mildly anxious but maintained good eye contact and was cooperative. (Tr. 367). Dr. Ritchie believed this to be more atypical chest pain and potentially a form of chronic neuropathy and anxiety. (Tr. 368). Island had been on Celexa with good results and was having good results on Gabapentin, but the side effects had prevented him from taking it as prescribed. (*Id.*). Given Island's history, physical exam, and workup, Dr. Ritchie believed these symptoms were likely GERD and chronic neuropathic pain, as opposed to other diagnoses such as ACS or anemia. (*Id.*). Island was instructed to follow up with his PCP and GI. (*Id.*).

Following his hospital visits and lab work, Island attended a primary care visit on May 12, 2022, where he stated he was having generalized bloating sensations in his abdomen, GERD symptoms like burning sensations in his throat with heartburn, and that he sometimes felt like his throat was tightening and closing off. (Tr. 356). Island had started taking a proton pump inhibitor ("PPI") to treat his GERD, and had since experienced intermittent constipation. (*Id.*). His physical exam revealed he was alert, oriented, not distressed, he had a regular heart rate and rhythm with no murmurs, his abdomen was soft, slightly tender to palpation and distended, his mood and affect were pleasant, but he was reported to be anxious with pressured speech. (Tr. 357). Dr. Barr recommended that he stop PPI, start glycolax powder, and follow-up with GI. (Tr. 358-59).

On July 26, 2022, Island attended a new patient primary care appointment with Krupa Parikh, M.D. (Tr. 348, 352). His physical exam revealed a normal heart rate and rhythm, no respiratory distress, no abdominal distention, and that he was alert with a normal mood. (Tr. 349-50). Island requested a meeting with psych and Dr. Krupa involved the behavioral health department to expedite the process and for ongoing therapy. (Tr. 353). Island reported he was prescribed Gabapentin as needed for his mood/anxiety but had not requested refills. (*Id.*).

After receiving a referral for his anxiety and PTSD, Island underwent a behavioral assessment on August 25, 2022. (Tr. 344). Michelle Fernandez LISW-S assessed Island who presented with symptoms of depression, anxiety, and PTSD. (*Id.*). Regarding his depression, he reported feeling an overall sense of sadness, anhedonia, feelings of hopelessness, increased fatigue, decreased focus/concentration, increased anger/psychomotor agitation, and lowered self-esteem. (*Id.*). He reported feelings of restlessness in relation to this anxiety (*Id.*). As for his PTSD, Island reported recurrent, intrusive, distressing memories and dreams of trauma,

flashbacks, avoidance of distressing memories and external reminders, persistent exaggerated negative belief about oneself, feelings of detachment from others, irritable behavior and angry outbursts, hypervigilance, difficulties staying asleep, and waking to symptoms of panic including a choking sensation, tightness in his stomach, and chest pain. (*Id.*). Island has previously seen a psychiatrist for anxiety, depression, and PTSD, and had previously attended therapy for his depression. (*Id.*). Island's behavioral observations and mental status exam noted that he appeared well groomed; was cooperative, but anxious; he was oriented to time, person, and place; his speech was spontaneous and exhibited a normal rate and flow; his thought process was logical and organized; he had no abnormal processes; his judgement and insight were fair; his recent and remote memory were within normal limits; his attention span and concentration were sustained; his mood was anxious; and his affect was full range. (Tr. 345-46). LISW-S Fernandez ultimately diagnosed Island with PTSD with panic attacks and major depression disorder, recurrent, severe, with anxious distress. (Tr. 346). She further speculated that his medical issues may be due to his inability to cope with his stress and mental health symptoms. (*Id.*). She recommended he be seen every two to three weeks and would benefit from CBT interventions. (*Id.*).

On May 26, 2023, Island saw a new primary care physician, Bhavik Patel, PA. (Tr. 614). He brought up his GERD as well as neck and shoulder pain that occurred when he moved. (*Id.*). Island stated that he could not swallow and felt like his mind would not allow him to swallow. (*Id.*). He claimed to be unsure what was triggering this, and he thought it may be stress. (*Id.*). He further reported that his mood was "horrible," and his chart noted that he was pacing the floor. (*Id.*). Island added that he was experiencing racing thoughts and nightmares. (*Id.*). Additionally, he reported to be sleeping poorly and had begun smoking cigarettes again. (*Id.*). He explained how he had failed multiple SSRIs due to poor tolerance. (*Id.*) PA Patel recommended Gene Sight

8

testing. (*Id.*). His physical exam revealed that he was not in acute distress, his heart rate and rhythm were normal, his pulmonary effort and breathing were normal, he was alert, oriented to person, place, and time as well as had a normal attention, mood, speech, and behavior. (Tr. 617-18). Island also exhibited normal and cooperative behavior during this visit. (Tr. 618). Island was to continue taking Gabapentin for the cervical radiculopathy and was referred to Behavioral Health. (Tr. 618). PA Patel believed Island's dysphagia was likely related to his anxiety and panic attacks. (Tr. 619).

On June 26, 2023, he followed up with PA Patel and claimed to be in the process of being seen by psychiatry and psychology. (Tr. 636). PA Patel marked Island positive for dysphoric mood and for sleep disturbance, and noted he was nervous/anxious. (*Id.*). Island's physical exam reported normal cardiovascular and pulmonary function, and his attention, perception, mood, and speech were within the normal range. (Tr. 639-40). Island also exhibited normal and cooperative behavior. (Tr. 640). PA Patel started Island on 50 mg of Zoloft and provided a list of trauma specialists for counseling. (*Id.*). Island was to continue taking Gabapentin for the cervical paraspinous muscle spasms. (*Id.*).

At his second follow-up visit with PA Patel on July 25, 2023, Island reported no improvement in his depression and anxiety symptoms. (Tr. 630). Island had also missed his psych appointment with Dr. Reisinger. (*Id.*). PA Patel marked Island positive for dysphoric mood and reported that Island was nervous/anxious. (*Id.*). Again, Island's physical exam reported normal cardiovascular and pulmonary function and that his attention, perception, mood, and speech were within the normal range. (Tr. 633-34). Island exhibited normal and cooperative behavior. (Tr. 634). PA Patel increased Zoloft to 100 mg. (*Id.*).

On August 3, 2023, Jamie James APRN - CNP performed Island's psychiatric evaluation. (Tr. 623). Island reported symptoms of depression, PTSD, anxiety, panic attacks, and mood swings. (*Id.*). He rated his mood a 5/10 and reported feeling worse when his anxiety increased; he also reported poor concentration, anhedonia, decreased motivation, four hours of sleep per night, and stomach swelling. (*Id.*). Island stated he experienced two to three anxiety attacks per day. (*Id.*). His panic attacks were followed by anticipatory anxiety and avoidant behavior. (*Id.*). As for his PTSD, Island reported recurrent, intrusive, distressing memories of the trauma; recurrent distressing dreams of trauma; flashbacks; avoidance of distressing memories and external reminders; persistent exaggerated negative belief about oneself; feelings of detachment from others; irritable behavior and angry outbursts; hypervigilance; difficulty staying asleep; and waking up to symptoms of panic like choking sensations, stomach tightness, and chest pain. (Tr. 624). Island further reported anticholinergic effects, constant dry mouth, racing thoughts and PTSD triggers. (*Id.*). His psychiatric review of symptoms included: anhedonia, depressed mood, tearfulness, feelings of hopelessness, feelings of worthlessness/excessive guilt, insomnia, fatigue, changes in appetite/weight, difficulty concentrating, and irritability, current depressed mood, increased guilt, no psychomotor slowing, no periods of increased and excessive energy, racing and rapid thoughts, no impulsive behavior, and sleeps 4 hours every 24 hour period on average and has broken sleep. (Tr. 625). Island's mental status evaluation reported him as alert and oriented to person, place, and situation; well-groomed with good hygiene; no abnormalities listed in behavior/motor; an attentive attitude towards the examiner and good eye contact; spontaneous speech, but at a normal rate and volume; a congruent mood; linear and logical thought processes; no suicidal or homicidal ideation; no auditory or visual hallucinations; no deficits in attention; notable concentration; intact recent memory; good insight; fair judgment; and his fund of

10

knowledge was adequate. (Tr. 627). The mental status evaluation marked that Island was anxious and endorsed paranoia. (*Id.*). CNP James diagnosed Island with PTSD, depression, and anxiety and recommended Island remain on 100 mg of Zoloft but begin to take 5 mg of Abilify for mood stabilization/paranoia and 0.5mg of Xanax for panic attacks until they stabilized. (*Id.*).

On November 22, 2023, Island saw CNP James for a psychiatric medication management visit. (Tr. 655). He had missed his last follow up due to a conflict and claimed to have run out of his medication two months prior. (*Id.*). He reported increased feelings of depression, anxiety, mood swings, panic attacks, racing thoughts, as well as poor sleep and appetite. (*Id.*). Island was tearful, sad, and endorsed intrusive thoughts of trauma. (*Id.*). Island further reported that Gabapentin was making his head "feel funny" and was experiencing an increase in "brain zaps" since abruptly stopping his medication. (*Id.*). He rated his mood to be a 2/10 and expressed feeling hopeless, worthless, and helpless. (*Id.*). In addition, Island reported poor concentration, anhedonia, and decreased motivation. (*Id.*). Besides his mood being marked as sad and that he appeared depressed, the rest of his mental status examination remained within the normal range: he was alert and oriented to person, place, and situation; appeared well groomed with good hygiene; had no abnormalities for his behavior or motor; his attitude towards the examiner was attentive and he exhibited good eye contact; his speech was spontaneous, at a normal rate and volume; had a congruent mood; exhibited linear and logical thought processes; denied suicidal or homicidal ideation, auditory or visual hallucinations; had no deficits in attention; notable concentration; his recent memory was intact; had good insight; fair judgment; and his fund of knowledge was adequate. (Tr. 657). CNP James' plan was to start Island on 5 mg of Buspar and 50 mg of Seroquel. (Tr. 658). CNP James spent time with Island discussing coping skills and anxiety management techniques, identifying his strengths and weakness, assessing his readiness

to quit substance use, how to deal with thoughts that are feeding and maintaining his depression symptoms, and explaining DBT techniques. (Tr. 359). CNP James also encouraged him to attend outpatient appointments and therapy. (*Id.*).

On December 23, 2023, Island presented to the emergency department with chest and abdominal pain. (Tr. 800). Island stated that after he ate he started to feel his typical GERD with generalized abdominal bloating, upper abdominal pain, and radiation midsternal and to the left anterior lateral chest. (*Id.*). He became lightheaded, and experienced subjective fevers, shortness of breath, and nausea. (*Id.*). He reported taking Omeprazole daily and took Motrin for this instance, but neither provided any relief. (*Id.*). His physical exam revealed a normal sounding heart and his pulmonary effort and breathing were normal too. (Tr. 803). However, abdominal distention was noted, along with abdominal tenderness. (*Id.*). Additionally, Island was reported to be alert and oriented to place, person, and time. (*Id.*). He exhibited normal behavior, thought content, and judgment. (Tr. 804). His EKG interpretation showed atrial fibrillation and that his heart rate was "irregularly irregular," but no ST segment changes. (Tr. 804). His chest x-ray showed no acute process, nor did his chest and abdomen CTA. (Tr. 805). Island was given one liter of IV fluid, Protonix, Pepcid, Zofran, 40 meq of potassium, and 500 mg of magnesium oxide. (*Id.*). Kimberly Okicki, PA, referred Island to cardiologist Wes Holiday, D.O. (Tr. 806).

Island followed up with PA Patel on December 27, 2023, regarding the onset of atrial fibrillation. (Tr. 679). He was still on 50 mg of Seroquel and 5 mg of Buspar but had missed his last psychiatric appointment. (*Id.*) He claimed that the 5mg of Buspar was helping, but felt it needed to be increased. (*Id.*). However, he had been off medication for about two weeks. (*Id.*). During this visit he was negative for chest pain as well as for behavioral problems, like confusion, dysphoric mood, sleep disturbance, and suicidal ideation. (*Id.*). He was

12

nervous/anxious. (*Id.*). Island's physical exam reported normal cardiovascular vitals. (Tr. 683).

Island's appearance, attention, perception, mood, and speech were normal. (*Id.*). Additionally, he

was alert and oriented to person, place, and time. (*Id.*). PA Patel noted that the Island was not

experiencing chest pain, syncope, or shortness of breath, and his EKG showed normal sinus

rhythm. (*Id.*). PA Patel believed that Island's anxiety was triggering his atrial fibrillation. (*Id.*).

On February 2, 2024, Island met with Dr. Holiday, a cardiologist, to establish a new

patient relationship and discuss his onset of atrial fibrillation. (Tr. 724). Dr. Holiday noted Island

"appears to be symptomatic when he is in atrial fibrillation." (*Id.*). He denied a history of

diabetes, hyperlipidemia, and cardiac disease, and his blood pressure was normal during this

visit. (*Id.*). Furthermore, Island was negative for shortness of breath, wheezing, chest pain,

palpitations, leg swelling, and psychiatric/behavioral symptoms. (Tr. 726). His physical exam

revealed a normal heart rate and rhythm; his PMI was not displaced; he had intact distal pulses;

his heart sounded normal (not distant/no murmurs); no respiratory distress, wheezing or rales; no

tenderness in his chest wall; he was alert and oriented to person, place, and time; and exhibited

normal behavior, thought content, and judgment. (Tr. 727). His EKG showed normal sinus

rhythm, nonspecific ST and T wave changes. (Tr. 728). Dr. Holiday started Island on DOAC,

25mg of Toprol XL, and told him to consider a sleep study and smoking cessation. (*Id*.).

On April 5, 2024, Island visited the emergency room reporting an allergic reaction after

drinking fruit punch. (Tr. 731). He experienced symptoms of facial and throat swelling. (Tr.

739). He further stated that is abdomen started swelling and his eyes went crossed. (*Id.*). No

swelling was noted and his respiratory rate was within limits (Tr. 739-40). His cardiovascular

symptoms were normal, his pulmonary effort was normal, he was alert and oriented to person,

place, and time, and his mood and behavior were normal. (Tr. 746). Island was breathing well

and his lungs sounded clear with no sign of anaphylaxis. (Tr. 747). He claimed that this had happened before and was told it was an allergic reaction; Island was feeling better and prescribed steroids. (Tr. 742, 747).

### C. Medical Opinion Evidence

On August 29, 2023, state agency reviewing psychological consultant, Raman Chahal, M.D., reviewed Island's record at the initial level. (Tr. 77-78). Dr. Chahal opined that Island did not have understanding and memory limitations; could maintain concentration, persist, and maintain pace on routine and repetitive detailed, but not complex, tasks for two hour periods and on simple tasks for extended periods to complete a workday/week on a sustained basis; could follow a routine schedule within customary tolerance; have limited public contact; and did not have adaption limitations. *(Id.)*.

State agency reviewing psychological consultant, David Dietz, Ph.D., reviewed the record at the reconsideration level on December 27, 2023. (Tr. 100-01). Dr. Dietz found the prior agency findings were consistent with and supported by the evidence on file, and opined that Island did not have understanding and memory limitations; could maintain concentration, persist, and maintain pace on routine and repetitive detailed, but not complex, tasks for two hour periods and on simple tasks for extended periods to complete a workday/week on a sustained basis; could follow a routine schedule within customary tolerance; have limited public contact; and did not have adaption limitations. (Tr. 100-01).

### D. Administrative Hearing Evidence

Island testified before an ALJ on June 12, 2024. (Tr. 34-65). He testified to living with his wife and six children in an apartment. (Tr. 42-43). He testified that his wife supports both him and his family because he has not worked since 2019. (Tr. 42, 56). In 2019, Island worked

14

for himself fixing little appliances and selling them online. (Tr. 42, 58). Before then he had not worked since about 2011. (Tr. 56). Island claims that his inability to work stems from not getting along with his bosses. (Tr. 44). He testified that his bosses claimed they were unable to deal with him, that he had a short temper, and "a personality disorder." (*Id*.). Island believes that the abuse he suffered throughout his childhood is what causes him to become panicky when his buttons are pushed and what creates a chaotic job environment. (Tr. 43).

Island testified that he was currently experiencing symptoms such as dysesthesia in his throat, stomach swelling, sleep deprivation, and bowel movement difficulty. (Tr. 43). However, his main concerns were his psychological symptoms. (Tr. 41). While Island smokes cigarettes, he stated he does not drink or use drugs but has used CBD and marijuana. (Tr. 61-62). Island testified that he could not sit through a two-hour movie and stated, "I probably couldn't concentrate for like 15 – just gets depressed." (Tr. 49). Island testified that he could shower every few days. (Tr. 51). He experiences feelings of paranoia and claims to only get along with his wife and those he sees in "psychiatric" because those individuals are the only ones who understand him. (Tr. 49-50). He reported having constant thoughts and becoming slightly suicidal at points, but that he can ultimately control himself. (Tr. 51, 53-54). Island testified that he has been receiving psychological treatment and is currently on medication and undergoing counseling and MBR therapy. (Tr. 45-47). Island takes medication every day, but suffers side effects like brain zaps, dizziness, and gas. (Tr. 62, 64). Despite treatment, he continues to experience hyperactivity, anger, dizziness, headaches, ringing ears, heart palpitations, sore joints and muscles, digestive issues (gas, indigestion, heart burn, acid reflux), and cannot gain weight. (Tr. 48).

Island testified that since 2019 his psychological issues have manifested into physical symptoms and reactions. (Tr. 46). Island testified that the mental and physical conditions are not separate from one another. (Tr. 47). Island has visited the ER several times because of his symptoms and testified that he was hospitalized in 2021. (Tr. 45, 47).  He further testified to losing 20 pounds in about a month due to his new diet which is supposed to help with his IBS. (Tr. 60). His IBS affects him throughout the day and night. (Tr. 51). He testified that his swollen stomach prevents him from having bowel movements. (*Id.*). He was told that these symptoms are a result of his PTSD. (Tr. 53).

Once Island's testimony concluded, VE John Pullman testified. (Tr. 65-70). For his first hypothetical, the ALJ asked the VE to consider an individual with no past work, who would be able to work at all exertional levels, but have the following non-exertional limitations: the individual would be limited to simple tasks, limited to occasional interactions with coworkers and superficial interaction with the public, need to avoid concentrated exposure to dust, fumes, gases, and poorly ventilated areas, and be limited to a static work environment where one could tolerate few changes in routine work setting, but when some changes would occur, any changes in job duties would need to be explained. (Tr. 66). The VE opined that such individual could work as a laundry worker I, DOT 361.684-014, SVP 2, medium physical demand as generally performed, with 26,000 jobs in the national economy; as a counter supply worker, DOT 319.687-010, SVP 2, medium physical demand as generally performed, with 84,000 jobs in the national economy; and as a machine feeder, DOT 699.686-010, SVP 2, medium physical demand as generally performed, with 23,000 jobs in the national economy. (Tr. 67).

For his second hypothetical, the ALJ asked the VE to consider all the same circumstances in the first hypothetical, except now this individual be limited to light exertional work and could

16

occasionally use ramps and stairs, never use ladders, ropes, or scaffolds, could frequently balance, and occasionally kneel, stoop, crouch, and crawl. (Tr. 67-68). The VE opined that such an individual could perform work as a cleaner, housekeeping, DOT 323.687-014, SVP 2, light physical demand as generally performed, with 234,000 jobs in the national economy; as a marker, DOT 209.587-034, SVP 2, light physical demand as generally performed, with 107,000 jobs in the national economy; and as a folding machine operator, DOT 208.685-014, SVP 2, light physical demand as generally performed, with 42,000 jobs in the national economy. (Tr. 68).

For a third hypothetical, the ALJ asked the VE to consider all the same circumstances from the second hypothetical, except the individual would need to take breaks and would be off-task 20 percent of any given workday. (Tr. 68-69). The VE opined that those limitations would preclude all work. (Tr. 69). Under questioning from Island's attorney, the VE opined that an individual who would be absent from work two or more days per month would preclude all work. (*Id.*).

## IV.    The ALJ's Decision

In his decision dated July 26, 2024, the ALJ made the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2021.

2.    The claimant has not engaged in substantial gainful activity since December 31, 2020, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

3.    The claimant has the following severe impairments: posttraumatic stress disorder ("PTSD"); depression; and generalized anxiety disorder (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: avoid concentrated exposure to dust, fumes, odors, gases, and poorly ventilated areas; limited to simple tasks; occasional interaction with coworkers; occasional, superficial interaction with the public; and is limited to a static work environment, tolerating few changes in a routine work setting and when said changes do occur, any changes in job duties will be explained.

6.      The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7.      The claimant was born on October 20, 1977, and was 43 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.      The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11.     The claimant has not been under a disability as defined in the Social Security Act, from December 31, 2020, through the date of the decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 20-29).

## V.     Law & Analysis

### A.     Standard for Disability[2]

Social Security regulations outline a five-step process the ALJ must use to determine

whether a claimant is entitled to benefits:

1.      whether the claimant is engaged in substantial gainful activity;

---

[2]   The regulations governing DIB claims are found in 20 C.F.R. § 404, *et seq.* and the regulations governing SSI claims are found in 20 C.F.R. § 416, *et seq.* Generally, these regulations are duplicates and establish the same analytical framework.  For ease of analysis, I will cite only to the relevant regulations in 20 C.F.R. § 404, *et seq.* unless there is a relevant difference in the regulations.

18

2.     if not, whether the claimant has a severe impairment or combination of impairments;

3.     if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4.     if not, whether the claimant can perform their past relevant work in light of his RFC; and

5.     if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant bears the ultimate burden to produce sufficient evidence to prove they are disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

### B.    Standard of Review

This Court reviews the Commissioner's final decision to determine if it is supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the substantial evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d

19

at 241. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court would not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, this Court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 749 (6th Cir. 2007).

## VI.     Discussion

Island raises three issues for this Court's consideration:

1.     Is a disability claimant's ability to appear briefly via telephone at an administrative hearing, absent additional explanation or justification, a factor relevant to the claimant's ability to sustain work relevant function?

2.     May an ALJ mischaracterize a claimant's ability to respond to questions at the administrative hearing and repeatedly rely upon such mischaracterization to undermine the claimant's allegations of disability?

3.     May the ALJ omit limitations found in credited opinion evidence from his or her own residual functioning capacity analysis without adequate explanation?

(ECF Doc. 8, p. 1).

In his brief, Island addresses the first two questions together and the third question separately; I do the same in my discussion here.

### A. The ALJ did not substitute his own lay opinion when crafting the RFC decision.

Island argues the ALJ mischaracterized his appearance at his telephone hearing and used this as an improper basis to discount the severity of and limitations imposed by his psychological symptoms. (ECF Doc. 8, p. 6). Island specifically questions whether his ability to appear briefly via telephone, without additional explanation or justification, is a factor relevant to his ability to maintain work related functions. (*Id.*). Island contends the ALJ did not "observe" him at all during the hearing and because it lasted less than 50 minutes, it was not an accurate representation of Island's disability allegations. (*Id.* at pp. 6-7). Additionally, Island disagrees with the ALJ's finding that he did not have any difficulty responding to the questions and asks whether disability allegations are undermined when an ALJ mischaracterizes the claimant and then relies on that mischaracterization. (*Id.* at p. 7). In support of his arguments, Island cites portions of the hearing transcript that show him rambling and his need for redirection. (*Id.* at pp. 7-9). Because Island needed redirection, reminders to answer the specific questions asked, and was told to slow down throughout the hearing, he argues the ALJ's RFC decision was based on what Island considers the ALJ's erroneous characterization of Island's appearance at the hearing.

In response, the Commissioner claims the ALJ never mentioned to have physically observed Island. (ECF Doc. 10, p. 11). Rather, the ALJ noted that the hearing was conducted via telephone and nothing in the regulations requires that an ALJ personally observe the claimant. (*Id.*). The Commissioner further contends that Island's arguments are merely an invitation for this Court to reweigh the evidence. (*Id.*).

As an initial matter, it appears that the thrust of Island's argument is on the ALJ's consideration of his subjective symptoms and whether it was proper for the ALJ to consider Island's conduct at the hearing in this context. (*See* ECF Doc. 8, p. 6 ("Plaintiff first cites error in the ALJ's reliance upon his appearance at the hearing as evidence adverse to his allegations of disabling mental health symptoms and limitations.")). I therefore construe Island's argument accordingly.[3]

A claimant's subjective symptom complaints may support a disability finding only when objective medical evidence confirms the alleged severity of the symptoms. *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989). Nevertheless, an ALJ is not required to accept a claimant's subjective symptom complaints and may properly discount the claimant's testimony about his/her symptoms when it is inconsistent with objective medical and other evidence.  See *Jones*, 336 F.3d at 475-76; SSR 16-3p, ("We will consider an individual's statements about the intensity, persistence, and limiting effects of symptoms, and we will evaluate whether the statements are consistent with objective medical evidence and the other evidence."). In evaluating a claimant's subjective symptom complaints, an ALJ may consider several factors, including the claimant's daily activities, the nature of the claimant's symptoms, the claimant's efforts to alleviate his/her symptoms, the type and efficacy of any treatment, and any other factors concerning the claimant's functional limitations and restrictions. SSR 16-3p; 20 C.F.R. § 416.929(c)(3); see also Temples v.

---

[3] Further, Island waives any arguments not raised in his brief and arguments mentioned only perfunctorily without argument. *Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 491 (6th Cir. 2006) ("we limit our consideration to the particular points that [Plaintiff] appears to raise in her brief on appeal."); see also *Dillery v. City of Sandusky*, 398 F.3d 562, 569 (6th Cir. 2005); *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones." (citation omitted)).

Comm'r of Soc. Sec., 515 F. App'x 460, 462 (6th Cir. 2013) (emphasis added) (stating that an ALJ properly considered a claimant's ability to perform day-to-day activities in determining whether his testimony regarding his pain was credible).

If an ALJ discounts or rejects a claimant's subjective complaints, he must state clearly his/her reasons for doing so. See *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994). Nevertheless, an ALJ's decision need not explicitly discuss each of the factors.  See *Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012) ("The ALJ is not required to discuss methodically each [factor], so long as he acknowledged and examined those [factors] before discounting a claimant's subjective complaints." (quotation omitted)). While the ALJ must discuss significant evidence supporting his/her decision and explain his/her conclusions with sufficient detail to permit meaningful review, there is no requirement that the ALJ incorporate all the information upon which he relied into a single tidy paragraph. See *Buckhannon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (6th Cir. 2010) (noting that the court "read[s] the ALJ's decision as a whole and with common sense").

Even so, an ALJ must temper their duty to evaluate the medical and other evidence with the temptation to "play doctor" by substituting her own medical judgment for that of medical professionals. *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990); accord *Meece v. Barnhart*, 192 F. App'x 456, 465 (6th Cir. 2006); *Winning v. Comm'r of Soc. Sec.*, 661 F. Supp. 2d 807, 823-24 (N.D. Ohio 2009) ("[A]n ALJ 'does not have the expertise to make medical judgments.'"). An ALJ might cross this line when they:

> (1) reject[] a medical opinion without relying on other evidence or authority in the record; (2) interpret[] raw medical data (e.g., uninterpreted x-rays and lab results); or (3) applies a sit-and-squirm test to assess a claimant's limitations based on observations at the hearing.

23

*See, e.g., Harris v. Comm'r of Soc. Sec.*, No. 1:14-cv-1212, 2015 WL 770340, at \*19 (N.D. Ohio, Feb. 23, 2015) (collecting cases indicating that an ALJ needs a medical opinion to interpret "raw medical data"); *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) ("[A]n ALJ must not substitute his own judgment for a physician's opinion without relying on other evidence or authority in the record."); *Weaver v. Sec'y of Health and Hum. Servs.*, 722 F.2d 310, 312 (6th Cir. 1983) (requiring an ALJ to cite evidence beyond personal observations).

Island is correct that an ALJ cannot rely on their lay opinion when considering medical evidence, however, there is no evidence in the record that the ALJ did that here. In fact, while Island alleges that the ALJ relied on his appearance at the hearing, the ALJ's decision demonstrates that when considering both the non-medical and medical evidence, the ALJ found Island's testimony and allegations were not entirely consistent with the record. (Tr. 24). The ALJ acknowledged that Island would appear with an anxious mood and would demonstrate pressured speech at medical appointments, but outside of these instances the ALJ found Island to have unremarkable mental statuses throughout the record. (Tr. 25). Furthermore, the ALJ specifically cites to portions of the medical record where Island maintained good eye contact, was considered cooperative, presented with a pleasant mood and affect, was oriented to time, person, and place, demonstrated logical and organized thought processes, his recent and remote memory were within normal limits, his attention span and concentration were sustained, he had a full range affect, was well groomed, and demonstrated good insight on many occasions. (Tr. 25). Therefore, while there is evidence in the record that speaks to Island's mental health impairments, the ALJ explains that when considering those with all the examination findings, prescriptions, treatment notes, and diagnoses, it does not support the level of impairment Island alleges. (*Id.*). Therefore, because the ALJ considered the complete medical record and explained

24

how his decision was "supported by, and consistent with, the evidence of record, including the medical evidence, examination findings, the persuasive portions of the medical opinions of the record, and the claimant's allegations consistence with the medical evidence" (Tr. 26) the ALJ provided a sufficient rationalization for his decision and demonstrated his reliance on the record rather than his lay opinion of Island at the hearing.

Additionally, this Court cannot reweigh evidence. *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (explaining "[t]he scope of review is limited to an examination of the record only. We do not review the evidence *de novo*, make credibility determinations nor weigh the evidence."). Upon review, I find that Island's arguments amount to a request for this Court to reweigh the evidence, a request that this Court cannot accept. (ECF Doc. 8, p. 7-9).

Because of this, I find that the ALJ properly based his findings on the non-medical and medical record and did not rely on his own opinions in his decision. Therefore, I do not recommend remand on this basis.

**B.      The ALJ articulated his consideration of the medical opinion evidence in accordance with Agency regulations.**

Island further questions whether an ALJ can omit RFC limitations found on the credited opinion evidence without explanation. (ECF Doc. 4, p. 10). Dr. Chahal and Dr. Dietz opined that Island could follow a "routine schedule" and limited him to "routine and basic workplace changes." (*Id.* at p. 11). Island argues because the ALJ limited the frequency of workplace changes and included that they would be explained, but did not include a "routine schedule" limitation, his departure mandated explanation. (*Id.*).

The Commissioner argues the ALJ is not required to include an exact, word-for-word equivalent of every limitation expressed by Dr. Chahal and Dr. Dietz. (ECF Doc. 10, p. 13). The

Commissioner claims the ALJ's limitation that Island work in a "static" work environment with few changes, which would be explained, accounted for the consultants' limitation of a "routine schedule" with minor variations. (*Id.*).

The evaluation of medical opinion evidence is governed by 20 C.F.R. § 404.1520c. This regulation mandates that the ALJ "will not defer or give any evidentiary weight, including controlling weight to any medical opinion(s)." 20 C.F.R. § 404.1520c(a). Rather, the ALJ must evaluate each medical opinion's persuasiveness based on its: (1) supportability; (2) consistency; (3) relationship with the plaintiff; (4) specialization; and, (5) "other factors that tend to support or contradict a medical opinion or prior administrative medical finding." 20 C.F.R. § 404.1520c(c); *see also Heather B. v. Comm'r of Soc. Sec.,* No. 3:20-cv-442, 2022 WL 3445856 (S.D. Ohio Aug. 17, 2022).

Supportability and consistency are the most important factors; ALJs must "explain how [they] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative findings in [their] determination or decision." 20 C.F.R. § 404.1520c(b)(2). ALJs "may, but are not required to," consider factors three through five when evaluating medical source opinions. (*Id.*).

For supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . the more persuasive the medical opinions . . . will be." 20 C.F.R. § 404.1520c(c)(1). For consistency, "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and non-medical sources in the claim, the more persuasive the medical opinion(s)." 20 C.F.R. § 404.1520c(c)(2).

An ALJ must "provide a coherent explanation of his [or her] reasoning." *Lester v. Saul*, No. 5:20-cv-01364, 20 WL 8093313 at *14 (N.D. Ohio Dec. 11, 2020), report and recommendation adopted sub nom., *Lester v. Comm'r of Soc. Sec.*, No. 5:20-cv-01364, 2021 WL 119287 (N.D. Ohio, Jan. 13, 2021). The ALJ's medical source opinion evaluation must contain a "minimum level of articulation" to "provide sufficient rationale for a reviewing adjudicator or court." *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844, 5858, 2017 WL 168819 (Jan. 18, 2017). If an ALJ does not "meet these minimum levels of articulation," it "frustrates this [C]ourt's ability to determine whether her disability determination was supported by substantial evidence." *Heather B. v. Comm'r of Soc. Sec.*, No. 3:20-cv-442, 2022 WL 3445856 at *3 (S.D. Ohio Aug. 17, 2022).

If the ALJ's RFC determination considered the entire record, the ALJ is permitted to make necessary decisions about which medical findings to credit and which to reject in determining the claimant's RFC. *See Justice v. Comm'r of Soc. Sec.,* 515 F. App'x 583, 587 (6th Cir. 2013). Even when the ALJ finds an opinion persuasive "there is no requirement that an ALJ adopt a state agency psychologist's opinion [ ] verbatim; nor is the ALJ required to adopt the state agency psychologist's limitations wholesale." *Reeves v. Comm'r of Soc. Sec.,* 618 F. App'x 267, 275 (6th Cir. 2015).

Here, the ALJ found the medical opinions partially persuasive. (Tr. 26). The persuasive portions were the consultants' moderate limitations in interacting with others and concentrating, persisting, or maintaining pace, and Island's limitation to simple tasks. (*Id.*). The ALJ found these limitations persuasive because they were supported by and consistent with the medical record. (*Id.*). As for the finding that Island has only a mild limitation in understanding, remembering, or applying information, and adapting or managing oneself, the ALJ did not find

27

persuasive because they were not supported by or consistent with the more complete medical record. (*Id.*). The ALJ discussed Island's depression, anxiety, and PTSD diagnoses, his treatment history, his prescriptions, the reports of anxious moods, and pressured speech to show how there should be moderate limitations in all four areas of mental functioning. (*Id.*). The ALJ explained that these diagnoses, prescriptions, and symptom reports further supported the finding that Island is limited simple tasks, occasional interaction with coworkers, occasional superficial interaction with the public, and a static work environment. (*Id.*). Because the ALJ considered the complete medical record and articulated why he credited only portions from the medical opinions, this Court can review his decision and determine that it was supported by substantial evidence. Thus, no error was committed.

With this, I find that the ALJ properly followed 20 C.F.R. § 404.1520c because he provided a thorough and complete review of Island's medical record, expressed in 20 C.F.R. § 404.1520c's required terms of "supportability" and "consistency." I therefore I do not recommend reversal on this issue.

## VII.    Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Island's applications for DIB and SSI be affirmed.

Dated: July 21, 2026

Reuben J. Sheperd
United States Magistrate Judge

_____

28

**OBJECTIONS**

**Objections, Review, and Appeal**

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C.§ 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

\* \* \*

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, \*2 (W.D. Ky. June 15, 2018) quoting *Howard*. The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).